THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN BOYCE, Defendant-Appellant.

First District (1st Division)    No. 80-1303

Opinion filed April 27, 1981.

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Barry A. Gross, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, John Boyce (defendant) was found guilty of rape, robbery, armed robbery and aggravated kidnapping. The trial court sentenced defendant to three concurrent 16-year sentences for rape, armed robbery and aggravated kidnapping. Defendant appeals.

Prior to trial, a hearing was held on defendant's motion to quash his arrest and suppress physical evidence. Defendant testified that, in his opinion, he was not violating any law at the time of his arrest at approximately 8:15 a.m. on September 15, 1977. The police took a blue denim jacket and a starter's pistol from him at that time.

The arresting officer, Investigator Michael O'Sullivan, testified he observed defendant at approximately 8 a.m. on September 15, 1977. He stated defendant was stopped for preliminary questioning because defendant fit the physical characteristics of the suspect in a pattern of six rapes which the officer was investigating.

Officer O'Sullivan testified that the day before the arrest he read six police reports in which rape victims gave descriptions of their assailant. These offenses occurred from August 23, 1977, to September 13, 1977, and from 5:35 a.m. to 10 a.m., with one at 8:30 p.m. All were in the same area, no more than four blocks apart. In each case the assailant was a Negro. Five victims approximated the age of their attacker as being about 20 and one estimated it at 17 years. Five reports showed the attacker as being 5 feet 4 inches to 5 feet 7 inches tall with one fixing his height at 5 feet 2 inches. All six reports described him as having brown eyes and

black hair. The latest report stated his hair was processed. Three used the word "dark" in describing his complexion and three said "medium." The reports all stated the assailant was armed with a handgun. All described him as wearing a blue jacket or a blue jean outfit. One described her assailant as wearing a "white" hat and another described his hat as "silver."

Investigator O'Sullivan stated defendant appeared to be a male Negro, 5 feet 5 inches tall and of medium build. Defendant had long processed black hair and wore a light blue denim jacket and a silver hat. Investigator O'Sullivan saw defendant in the area in which the six rapes had occurred at a time "reasonably close" to the time of five of the six rapes.

Investigator O'Sullivan and his partner questioned defendant as to his name, address and current activities. The officers then conducted a protective "frisk" of defendant because all of the six police reports had indicated the assailants had been armed. The officers found a silver-colored starter's pistol in defendant's shirt pocket. Defendant was then arrested. The motion to quash the arrest and to suppress physical evidence was denied. A pretrial hearing was also held on defendant's motion to suppress identification testimony. The motion was denied.

At trial, complainant testified she was accosted by defendant at approximately 6 a.m. on August 23, 1977. Defendant placed an object in her back and said, "Keep quiet, bitch, or I'll blow your back off." As defendant then walked complainant through an alley and into a nearby basement, complainant was able to observe defendant's face. Inside the basement, she was ordered to lie down while defendant searched her purse. Complainant observed defendant was holding a gun. Defendant took money and food stamps from her purse. Defendant then proceeded to search complainant's person and ordered her to undress. Complainant complied. Defendant then raped her twice. Complainant was able to observe the pistol held by defendant. As defendant left the basement, she was again able to observe his face.

Complainant then returned home and notified the police. An officer testified he accompanied her to the scene of the rape and then took her to the hospital. Medical evidence indicating the presence of sperm was stipulated to by the parties.

Complainant further testified that on September 15, 1977, she identified defendant's photograph from a group of over 100 photographs at the police station. She subsequently identified defendant at a lineup. In open court, complainant again identified defendant as her assailant. She also identified the starter's pistol seized from defendant as the weapon held by defendant during the offense.

For defendant, LeRoy Johnson testified he owned a restaurant on

Madison Street and Laramie in Chicago. Defendant was in his employ on August 23, 1977. Johnson had no personal knowledge whether defendant was actually at work on that day.

Defendant's wife testified defendant left home at 5:30 a.m. on August 23, 1977, to go to work. He did not wear a jacket on that day.

Defendant testified he left his home at 5:30 a.m. on August 23, 1977, to go to work at Johnson's restaurant. He did not wear a jacket on that day. He arrived at work at 6 a.m. He did not leave the restaurant until 3 p.m. On the day he was arrested, he was wearing a silver cap and a blue jacket. He had borrowed the latter from his brother. Defendant denied the starter's pistol belonged to him. He contended he had been in the process of returning it to its proper owner, either his wife's brother or a cousin, when arrested. He categorically denied his guilt. Defendant also admitted he had previously been convicted of a felony.

On rebuttal, LeRoy Johnson testified defendant had been hired to work from 7 a.m. until 3 p.m. A surrebuttal witness, Joyce Jones, testified she had recommended defendant for his job at Johnson's restaurant. She could not recall whether she had seen defendant at the restaurant on August 23, 1977.

In this court defendant raises no point on the sufficiency of the evidence to prove guilt beyond a reasonable doubt. No point is raised concerning the identification of defendant by photograph, lineup or in court.

## I.

Defendant's initial argument is the police stop and frisk on September 15, 1977, was improper. The courts of Illinois have consistently held (*People v. Beacham* (1980), 87 Ill. App. 3d 457, 464, 410 N.E.2d 87):

> "The burden of proving that a search and seizure in a public place was unlawful is on the person who seeks to quash his arrest or suppress evidence seized during the search. [Citations.] A court of review must affirm the trial court's ruling on the motion unless the * * * court's ruling is manifestly erroneous."

The constitutional limitations on the legal right of a police officer to stop and temporarily detain a suspect without probable cause to arrest were first set forth in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, and *Sibron v. New York* (1968), 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889. The legal principles from these cases were codified in the Illinois Criminal Code (Ill. Rev. Stat. 1977, ch. 38, pars. 107—14, 108—1.01):

> "§107—14. Temporary Questioning without Arrest. A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when

the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped."

"§108—1.01. Search During Temporary Questioning. When a peace officer has stopped a person for temporary questioning pursuant to Section 107—14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons. If the officer discovers a weapon, he may take it until the completion of the questioning, at which time he shall either return the weapon, if lawfully possessed, or arrest the person so questioned."

The *Beacham* court also stated (87 Ill. App. 3d 457, 464):

"The test to determine the reasonableness of the officers' actions in stopping and frisking defendant is whether specific and articulable facts and circumstances exist which lead the officers to reasonably believe that the defendant is committing, is about to commit, or has committed a criminal offense."

We find sufficient specificity in the testimony of Investigator O'Sullivan at the suppression hearing to satisfy this standard. The six rapes described in the police reports all had taken place within a 4- or 5-block radius. All offenses occurred in only a 3-week period prior to the stop with the most recent having occurred only 2 days before. Significantly, five of these six rapes occurred within the early morning hours. Such factors could very well, in the mind of an experienced police officer, establish a recurring pattern to which the officer would be alerted. That defendant was present during the early morning hours in this area, with a high incidence of crime, are factors supporting the officers' decision to stop defendant. See *People v. McGowan* (1977), 69 Ill. 2d 73, 78-79, 370 N.E.2d 537, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624; *People v. Shoepke* (1979), 77 Ill. App. 3d 1026, 1030, 397 N.E.2d 225.

These factors gain even greater weight when coupled with Investigator O'Sullivan's observations of defendant's physical appearance on September 15, 1977. He observed defendant to be approximately 5 feet 5 inches tall and of medium build. This is well within the range of descriptions articulated in the police reports. Defendant was wearing a light blue denim jacket, as was worn by the assailants in four of the six reports. Defendant had processed hair. One police report described the assailant as having processed hair. The facts here are strongly sufficient to warrant the stop and search of defendant. See *McGowan*, 69 Ill. 2d 73, 78.

We find the cases cited by defendant readily distinguishable. In *People v. Talley* (1975), 34 Ill. App. 3d 506, 507, 340 N.E.2d 167, the defendant and a companion had been stopped by the police because they "fitted the description" of two suspects wanted for a crime committed three days previously in the same area. This court reversed the conviction, noting the testimony of the arresting officer was merely a conclusion. No details of the description of the suspects were presented to the trial court. Because the trial court had no objective facts before it, the right to stop and frisk was properly denied.

In *People v. Byrd* (1977), 47 Ill. App. 3d 804, 365 N.E.2d 443, the defendant had been stopped by the police 14 blocks from the location of an armed robbery. The arresting officer based his stop on a description of the suspect broadcast on the radio 24 hours prior to the stop. This court noted the description of the suspect was itself broad enough to fit a "myriad of individuals" (47 Ill. App. 3d 804, 808). The court held the general nature of the description combined with the remoteness of the location and time of the stop were insufficient to justify the stop.

Section 108—1.01 of the Illinois Criminal Code, as detailed above, specifically provides for a weapons search if the officer reasonably suspects he may be in danger of attack. (Ill. Rev. Stat. 1977, ch. 38, par. 108—1.01.) In each of the six police reports read by Investigator O'Sullivan, the assailant was reported armed with a handgun. Thus, it was proper for the officers to conduct a preliminary search of defendant. *McGowan*, 69 Ill. 2d 73, 79.

■■ The denial of the motion to suppress by the trial court, far from being "manifestly erroneous", is strongly supported by the evidence and is legally proper. The ruling is affirmed.

## II.

Defendant also submits the trial court erred in rejecting defendant's offer in evidence of a copy of his former employer's business record. Defendant argues that because business records made in the ordinary course of business are admissible, an accurate copy should also be admissible. Ill. Rev. Stat. 1977, ch. 38, par. 115—5(a); ch. 110A, par. 236(a).

This argument is not applicable to the facts before us. Outside the presence of the jury, defendant announced his intention to call his former employer, LeRoy Johnson, as a witness. The People objected to any attempt by defendant to elicit testimony from Johnson regarding a business record. Defendant's offer of proof was if Johnson were allowed to testify, he would state he had owned the restaurant at which defendant was employed on August 23, 1977. Johnson would also testify that after he was served with a subpoena, he had a copy of defendant's employment

record for August 23, 1977, made by another employee. He mailed this copy to defendant's counsel after checking it to be accurate. Johnson would also testify the original record had since been lost.

After argument of counsel, the trial court concluded defendant would not be allowed to elicit this testimony from Mr. Johnson. The trial court ruled the copy was not a business record kept in the ordinary course of business, but rather a record made while litigation was pending and was therefore inadmissible.

■■ As shown, defendant's offer of proof revealed the former employer had the copy of the record made after receiving a subpoena from defendant's counsel in December 1977. Illinois statutory law expressly provides (Ill. Rev. Stat. 1977, ch. 38, par. 115—5(c)(2)):

> "No writing or record made in the regular course of any business shall become admissible as evidence by the application of this Section if:
> * * *
>
> Such writing or record has been made by anyone during an investigation of an alleged offense or during any investigation relating to pending or anticipated litigation of any kind."

In our opinion, this statute required exclusion of the copy by the trial court. Although the copy was not made by a party to the suit, it was nevertheless made with a view toward litigation. Such documents are inadmissible as evidence. *Terminal-Hudson of Illinois, Inc. v. Goldblatt Brothers, Inc.* (1977), 51 Ill. App. 3d 199, 205, 366 N.E.2d 486, citing *Ocasio-Morales v. Fulton Machine Co.* (1973), 10 Ill. App. 3d 719, 725, 295 N.E.2d 329, *appeal denied* (1973), 54 Ill. 2d 593.

Defendant's argument that copies of documents are admissible where the original is unavailable is inappropriate to this situation, as are the cases upon which defendant relies. In *Lombard v. Johnson* (1875), 76 Ill. 599, both the original document and the copy of the original were introduced as evidence. The copy entered into evidence in *Pugh v. Bershad* (1971), 133 Ill. App. 2d 174, 178, 272 N.E.2d 745, had not been made in preparation for trial. The cases of *Pittsburg, Cincinnati, Chicago & St. Louis Ry. Co. v. City of Chicago* (1909), 242 Ill. 178, 89 N.E. 1022, and *Burns v. Schmidt* (1961), 22 Ill. 2d 47, 174 N.E.2d 188, dealt with applications of the "best evidence" rule which is inapplicable to this situation. Similarly, *People v. Nickson* (1978), 58 Ill. App. 3d 470, 481, 374 N.E.2d 804, *appeal denied* (1978), 71 Ill. 2d 612, is concerned with admission in evidence of documents held to have been prepared in the ordinary course of business.

In addition, defendant testified he was at his place of employment at the time the instant offenses were committed. However, the jury heard evidence of complainant's positive identification of defendant as her

assailant through his picture in police files, at a subsequent lineup, and again in open court. Complainant identified the starter's pistol seized from defendant as the weapon used in her assault. (See *People v. Moore* (1969), 42 Ill. 2d 73, 76-77, 246 N.E.2d 299, *modified* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562.) It should be noted complainant was at all times close to defendant. She testified to her ample opportunity to observe both him and the pistol. Any possible error in the refusal of the trial court to admit the document therefore qualifies as harmless error. (*People v. Collins* (1979), 70 Ill. App. 3d 413, 428-29, 387 N.E.2d 995.) Under the circumstances here, in view of the strength of the evidence of guilt, even error of constitutional dimensions would be considered harmless. *People v. Collins* (1980), 85 Ill. App. 3d 1056, 1060, 407 N.E.2d 871.

For these reasons the judgments appealed from are affirmed.

Judgments affirmed.

O'CONNOR and CAMPBELL, JJ., concur.