THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BARRY D. GRUNER, Defendant-Appellant.

Second District No. 83—1025

Opinion filed February 19, 1985.

Richard J. Short, of McHenry, for appellant.

Theodore Floro, State's Attorney, of Woodstock (Phyllis J. Perko, William L. Browers, and Sally A. Swill, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCHNAKE delivered the opinion of the court:

The defendant, Barry D. Gruner, was charged by information with reckless homicide. (Ill. Rev. Stat. 1983, ch. 38, par. 9—3.) Following a jury trial he was convicted of that offense and sentenced to a 30-month term of probation, which included a six-month jail sentence. He was also fined $1,000. The defendant appeals, contending (1) that he was not proved guilty beyond a reasonable doubt; (2) that the trial court improperly admitted evidence of the concentration of alcohol in his breath as shown by a test administered to him after his arrest; and (3) that the trial court improperly excluded evidence of the concentration of alcohol in the decedent's blood.

This case arose out of a collision between the defendant's car and a car driven by Ricky Geren. Geren died as a result of injuries sustained in the collision. The accident occurred on April 9, 1983, in the early morning hours, on Route 14, just west of Borden Street in Cary. At the location of the collision, Route 14 is a two-lane road that runs in a northwest-southeasterly direction.

The State presented two occurrence witnesses, Diane Van Allen, who had been a passenger in the decedent's car on the night in question, and Christine Militello, who had been driving her car behind Geren's at the time of the accident.

Van Allen testified that on the night in question she and her friend, Debbie Stoddard, went to Harrigan's, a tavern in Crystal Lake, sometime between 11 p.m. and midnight. Van Allen was driving her car, and Stoddard was a passenger. Van Allen had previously been at the Bring Her Inn in Crystal Lake, where she had one beer. While she was at Harrigan's, Van Allen had three more beers.

At about 1 a.m., she saw Ricky Geren in the tavern. She played darts and visited with him, Stoddard, and others. Van Allen, Stoddard, and Geren eventually decided to go dancing at Peabody's, a bar in Cary, and they left Harrigan's at about 1:50 a.m. Van Allen stated that when she first saw Geren in Harrigan's, he had a mixed drink in his hands, and that he had one more before they left. She stated, however, that he did not appear to be under the influence of alcohol.

When they left Harrigan's, it was agreed that Stoddard would drive Van Allen's car, and Van Allen would ride in Geren's car, a red Corvette. Stoddard left about five minutes before Geren and Van Allen.

Van Allen testified that as she and Geren approached the scene of the accident from the west, they were traveling 30 to 35 miles per hour. The speed limit at that location was 30 miles per hour. It was raining. Geren and Van Allen were talking to each other. She testified

that Geren "was glancing at me, back and forth between me and the road." She then saw a car approaching from the east more than halfway in their lane. The other car was about two car lengths away. Geren jerked the steering wheel violently to the right, and the cars collided. The other car hit the Corvette on the driver's side. After the collision, the Corvette did not travel much, if at all. Geren was unconscious immediately after the crash.

On cross-examination, Van Allen stated that at Harrigan's Geren told her that he had just purchased the Corvette a week before and wanted to show it to her. She said that when they left, Geren had not finished the second drink she saw him with. She did not smell alcohol on his breath at that time or later on in the car.

When they were driving east toward the accident, Geren had the radio on. Van Allen characterized the rain as "steady." She testified that when Geren would look at her, he would take his eyes off the road for a second or two. After one of these glances, Van Allen heard Geren say "shit." She looked forward and then saw the other car. She was able to determine that the other car was partially in the eastbound lane because she could see the center line. After Geren jerked the steering wheel to the right, the Corvette went partially onto the shoulder of the road before the impact.

Christine Militello, who had been driving her car behind the Corvette at the time of the accident, testified that on the night in question from about 10 p.m. until about 11:45 p.m. she was at Cat Ballou's, a tavern in Crystal Lake. Militello had two beers there. When she left, she went to Harrigan's, arriving at about 12:10 a.m. Militello testified that she had nothing to drink at Harrigan's. She listened to music and visited with friends.

According to Militello, at about 1:30 a.m. she left Harrigan's to meet her sister at Peabody's. She was driving her Dodge Omni and was alone. She noticed a Corvette traveling east ahead of her. There were no cars between her Omni and the Corvette. It was raining. As they approached the scene of the accident, both cars were traveling about 30 to 35 miles per hour. Militello testified that she saw a car approaching from the east "half over into the eastbound lane." She saw the Corvette start to swerve to the right, and then the collision occurred. The left front of the westbound car hit the left side of the Corvette right around the front wheel. The westbound car "kept running along the side of the Corvette," "came around the back" of it, and cut in front of Militello's car, and pulled over onto the shoulder of the eastbound lane. She did not see the westbound car swerve after it hit the Corvette.

Militello testified that she drove into the westbound lane to avoid the car which cut in front of her. She drove back into the eastbound lane and then parked in a nearby driveway. Militello got out of her car and went over to the Corvette, where she saw Geren unconscious. Van Allen, who was very upset, said to her, "Oh, my God, did you see that car over in our lane?"

On cross-examination, Militello characterized the rain just prior to the accident as "just above a drizzle." She said that visibility was very good.

The State presented evidence that the defendant was the driver of the westbound car, which was a Ford Thunderbird. Several witnesses testified that after the collision he appeared to be under the influence of alcohol. There was testimony that his cheeks were flushed and his eyes bloodshot. Officer Giallombardo of the Cary police department testified that the defendant did not perform well on certain field sobriety tests. The State also introduced the results of the defendant's breath test which showed an alcohol concentration of 0.15, based on the definition set forth in section 11−501.2 of the Illinois Vehicle Code. (Ill. Rev. Stat. 1983, ch. 95½, par. 11−501.2.) According to that provision, a person is presumed to be under the influence of alcohol if the concentration is 0.10 or more. (The jury was instructed that this presumption was not binding on it, and that other evidence on the question of intoxication could properly be considered.)

Officer Dennis Keys, the evidence technician for the Cary police department, testified concerning his investigation of the scene. He stated that the body of the Corvette was made of fiberglass and that the debris at the scene consisted mostly of fiberglass which had broken off the body of the Corvette. The debris was located primarily in the eastbound lane of Route 14. One piece of debris, also fiberglass, was found on the shoulder of the westbound lane. Officer Keys expressed his opinion, based on the location of the vehicles and debris after the collision, that the impact occurred in the eastbound lane.

On cross-examination, Officer Keys was asked whether the impact could have occurred a "matter of inches" south of the center line, and he replied, "I wouldn't be able to speculate on that at all due to the weather conditions."

The defense presented one occurrence witness, the defendant himself. He testified that on the day in question he met his friend, Robert Salzman, at the latter's place of business in Elk Grove Village. They had planned to shop for uniforms for their softball team that afternoon. They left Salzman's place of business at about 3:30 p.m. and went to Bennigan's, a tavern in Schaumburg, each of them driving his

own car. They stayed at Bennigan's for an hour to an hour and a half, and during that time the defendant had two beers and a cup of clam chowder.

From Bennigan's they went to a sporting goods store in downtown Palatine to look at uniforms. They were at the store for about a half hour, and upon leaving took with them two or three pamphlets advertising uniforms.

The two then proceeded to Gimmicks, a bar on Route 14 in Palatine, arriving at about 6:30 p.m. The defendant stayed there until about 1:45 a.m. While there, he looked at the brochures with Salzman, played pool and video games, and visited with other patrons of the tavern. The defendant testified that while he was at Gimmicks he had seven beers and two large pieces of deep-dish pizza.

When he decided to go home, the defendant told Salzman he was leaving because he had a golf date in the morning. The defendant testified that when he left the bar, it was pouring rain. He drove westbound on Route 14 toward his home in Cary. On the way, he passed numerous traffic lights and went through the business district of Fox River Grove. When he reached Cary, he was driving very slowly. Visibility was down to about 25 feet because of the rain. The defendant was using the white fog line at the side of the road as a reference point. As he approached the scene of the accident, he could not see the center line.

The defendant testified that as he was driving westbound, he saw a "body of red" about five feet ahead of him, and then the collision occurred. At the moment of impact he was in his own lane, although he might have been very close to the center line. He stated that he felt the left front end of his Thunderbird go up in the air. The left front of his car moved along the side of the Corvette and then dropped to the pavement. At that point he was unable to steer. His tire was locked in a position that forced his car to jump into the eastbound lane, and his car traveled forward for about 50 to 100 feet before it stopped. He then pulled it over onto the shoulder of the eastbound lane, where he sat and waited until a police officer arrived a few minutes later.

As a result of the collision, the defendant received a superficial wound on the top of his head. The defendant denied that he performed poorly on the field sobriety tests.

On cross-examination, the defendant testified that when he first saw the "body of red" of the Corvette, it was almost parallel to his car. He stated that the initial impact might have occurred in the center of the road. He also said that he had been going 25 to 30 miles

per hour at the time of the collision.

The defense also presented the testimony of the defendant's friend, Salzman, which essentially corroborated that given by the defendant concerning events occurring before his departure from Gimmicks. Salzman stated that in his opinion the defendant was not under the influence of alcohol when he left. Salzman said that his friend's face was not flushed and his speech was not slurred, and that he had no difficulty walking.

The defense also introduced, by way of stipulation, that there was some alcohol in the decedent's blood, but the trial court prohibited the defense from presenting evidence of the concentration of alcohol, which had been determined to be 0.18.

Whitey Hursh, a tow truck driver who responded to the scene at the request of the Cary police department, also testified for the defense. He stated that when he arrived at the scene, Officer Keys directed him to pick up the debris. According to Hursh, the debris was scattered from right about the center line towards the south side of the road.

The defense also presented evidence that on the morning after the collision, when the Corvette was being towed into an auto body shop to be photographed, the dust cap fell from the left front wheel. There was a castle nut covered with grease inside the dust cap. Several witnesses testified that the threads on the castle nut were not stripped. It is undisputed that the threads of the spindle onto which the castle nut fit were also not stripped. Daniel Streit, an auto mechanic and the owner of the body shop, testified as follows:

"THE WITNESS: If the castle nut came loose [while the Corvette was being driven] it would loosen the bearings which would come out of the rotor which in turn would have to make it [the wheel] start wiggling and the only thing that would hold it on at that point would be the calipers which are the brakes that go in the calipers.

MR. SHORT [defense counsel]:

Q. If someone were to make a violent or any movement of a Corvette especially, turning in any direction, what would the result be as far as that left front wheel?

A. It would definitely turn that way.

Q. Would it lock the wheel?

A. It would lock."

In rebuttal, the State introduced a dust cap, castle nut, and pieces of a cotter pin. The State's witnesses testified that these items were from the left front wheel of the Corvette, and the witnesses estab-

lished a satisfactory chain of custody for them. A forensic scientist with the Illinois Department of Law Enforcement had cleaned off the grease. The threads on the castle nut were completely stripped with the exception of one small section. Royce Donner, a professional engineer, testified for the State that in his opinion the damage to the castle nut was caused by the collision.

The defendant contends that the foregoing evidence was insufficient to prove his guilt beyond a reasonable doubt. The offense of reckless homicide is defined in section 9—3 of the Criminal Code of 1961 as follows:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of the death consists of the driving of a motor vehicle, in which case the person commits reckless homicide." (Ill. Rev. Stat. 1983, ch. 38, par. 9—3.)

The mental state of recklessness is defined in section 4—6, in pertinent part, as follows:

> "A person *** acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1983, ch. 38, par. 4—6.

 In the instant case there was ample evidence that the defendant was intoxicated at the time of the accident. In addition, two eyewitnesses testified that the collision occurred in the decedent's lane of traffic. Although the collision occurred at nighttime when it was raining, Christine Militello, the driver of the the car directly behind the decedent's Corvette, testified that visibility was very good. Under these circumstances, the jury was justified in finding the defendant guilty beyond a reasonable doubt. See *People v. Davis* (1982), 105 Ill. App. 3d 129, 434 N.E.2d 13 (reckless homicide convictions affirmed where the defendant, while intoxicated, drove his car into the victims' lane of traffic, striking their car).

 While in the instant case the defendant presented conflicting testimony on the question of his intoxication and the location of the collision, it was the prerogative of the jury to resolve the conflicts as it did. It was also the jury's prerogative to resolve the conflicting evidence concerning whether the left front wheel assembly of the Cor-

vette was defective prior to the collision. A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) In our judgment, the State's evidence was not at all improbable and was sufficient to prove the defendant's guilt beyond all reasonable doubt.

*People v. Walljasper* (1981), 97 Ill. App. 3d 81, 422 N.E.2d 251, cited by the defendant, is readily distinguishable from the instant case. In *Walljasper* the cause of the accident was an icy patch of roadway which the defendant would not have been able to negotiate safely even if he had been completely sober. In fact, another driver had lost control of her vehicle on the same icy patch shortly before the fatal accident. In the instant case, if the conflicts in the evidence are resolved in the State's favor, as they apparently were by the jury, there is no indication that anything other than the defendant's recklessness could have caused his car to travel into the opposite lane.

■ The defendant's next contention is that the trial court improperly admitted evidence of the concentration of alcohol in his breath, *i.e.*, 0.15, as shown by a test administered to him after his arrest. On the second day of trial, the defense presented a motion to exclude the test results. The motion alleged that after the collision the defendant was arrested for a violation of section 11—501 of the Illinois Vehicle Code (Ill. Rev. Stat., 1982 Supp., ch. 95½, par. 11—501) (driving while under the influence of alcohol) or a local ordinance equivalent. He was charged with such offense by the city of Cary, but the charge was nol-prossed when the State decided to bring the reckless homicide charge. According to the defendant's motion, after he was arrested, the police read him the nine-paragraph warning required by section 11—501.1 of the Code as amended by Public Act 82—221. (Ill. Rev. Stat. 1981, ch. 95½, par. 11—501.1.) One of those warnings was that, if he took the breath test, the results could be introduced in evidence against him "to support the charge of driving while under the influence of intoxicating liquor." The defendant sought to exclude the results of the breath test under subsection (c) of that statute, which provided in pertinent part, "No evidence of any test taken pursuant to this Section is admissible in any criminal proceeding except in a proceeding under Section 11—501." Since the charge under that provision had been nol-prossed, the defendant argued, the trial was not a "proceeding under Section 11—501," and

the test results were inadmissible. He also maintained that use of the test results in the reckless homicide prosecution would violate his constitutional rights because his consent to take the test was limited so that it would be valid only in a prosecution for driving while under the influence of alcohol. The defendant's motion to exclude the test results was denied, and as noted above, they were admitted into evidence at trial. In this court, the defendant presents essentially the same arguments he presented at trial on this issue.

We will first address the contention that the test results should have been excluded under section 11—501.1 as amended by Public Act 82—221. Public Act 82—221 was passed by our General Assembly on June 18, 1981. Later that same day our legislature passed Public Act 82—311, which also amended section 11—501.1 (see *People v. Frye* (1983), 113 Ill. App. 3d 853, 859, 447 N.E.2d 1065). Both laws took effect on January 1, 1982, over a year before the accident involved herein took place. Whereas section 11—501.1, as amended by Public Act 82—221, includes the language upon which the defendant relies, limiting the use of tests taken under that section to "proceeding[s] under Section 11—501," as amended by Public Act 82—311, section 11—501.1 does not include that exclusionary rule. Ill. Rev. Stat. 1981, ch. 95½, par. 11—501.1.

Section 6 of "An Act to revise the law in relation to the construction of the statutes" provides, in pertinent part:

"Two or more Acts which relate to the same subject matter and which are enacted by the same General Assembly shall be construed together in such manner as to give full effect to each Act except in case of an irreconcilable conflict. In case of an irreconcilable conflict the Act last acted upon by the General Assembly is controlling to the extent of such conflict. * * *

An irreconcilable conflict between 2 or more Acts which amend the same section of an Act exists only if the amendatory Acts make inconsistent changes in the section as it theretofore existed." (Ill. Rev. Stat. 1983, ch. 1, par. 1105.)

Of the two Acts amending section 11—501.1, Public Act 82—311, which does not include the exclusionary provision upon which the defendant relies, was "the Act last acted upon by the General Assembly," and thus would be controlling in the case of irreconcilable conflict. (*People v. Frye* (1983), 113 Ill. App. 3d 853, 447 N.E.2d 1065.) The defendant argues, however, that the two Acts are not in irreconcilable conflict, and that we should, therefore, give effect to the exclusionary provision in section 11—501.1 as amended by Public Act 82—221.

We need not consider the defendant's interesting arguments in this regard, although it should be noted that in *Frye* the court concluded that "[r]econciliation of the two [Acts] is well beyond the best powers of even a Byzantine theologian." (*People v. Frye* (1983), 113 Ill. App. 3d 853, 859, 447 N.E.2d 1065.) The reason this question need not be considered is that over a year after our General Assembly passed the two Acts discussed above, it enacted Public Act 82—783, which took effect prior to the accident involved herein. (1982 Ill. Laws 1233.) Article III of the latter act states that it "provides for the non-substantive revision *** of Sections of Acts necessitated by the amendment *** of Sections by two or more Public Acts of the 82nd General Assembly, which multiple action was not resolved by one of the Acts affecting the particular Section." (1982 Ill. Laws 231-32.) Section 37 of article III provides that section 11—501.1 is amended to read as it was amended by 82—311. (1982 Ill. Laws 328-35.) Our legislature has, therefore, chosen between the two prior versions of section 11—501.1, and it has selected the one which does not include the exclusionary provision upon which the defendant relies. Accordingly, section 11—501.1 as amended by Public Act 82—221 is not applicable to this case and cannot provide a basis for exclusion of the results of the defendant's breath test.

The defendant has cited no authority in support of his contention that admission of the test results into evidence violated his constitutional rights. The entire argument on this point in the defendant's brief is as follows:

"To hold otherwise [than requested by the defendant] would disregard the basic reason why implied consent Statutes have been constitutionally upheld in the face of the constitutional right against self incrimination.

If both the refusal to take the test and the test results are admissible in evidence against the Defendant, how is his constitutional right against self-incrimination satisfied?

He impliedly consents, in return for a driver's license to take the test or *lose his license* for a period of time. It can hardly be said that he impliedly consents to take the test or must confess against himself as being intoxicated in a reckless homicide felony case.

When the officer, as required by Statute, explains that a refusal may result in a six month suspension, this is not the equivalent of saying take the test and you might go to the penitentiary [*sic*]? The Statutory warning says nothing about the results of the test being used in a felony criminal trial.

Even if the Court is to say that the latter passed Statute [Public Act 82—311] controls, will the refusal to take the test or the test results both be admissible in a prosecution for reckless homicide where the alleged violation of [section 11—501] was dismissed and not tried simultaneously?"

It is clear that the defendant's argument on this point, aside from its lack of citation of authority, does little more than posit questions and state conclusions, and it is devoid of any meaningful legal analysis. Under these circumstances, we will not rule on the merits of the argument. *People v. Ortiz* (1980), 91 Ill. App. 3d 466, 414 N.E.2d 1072.

■■ The defendant's final contention is that the trial court improperly excluded evidence of the concentration of alcohol in the decedent's blood. The accident which gave rise to the criminal charge in the instant case occurred at about 2 a.m. on April 9, 1983. The decedent, Ricky Geren, was pronounced dead at Good Shepherd Hospital in Barrington a short time later, and his body was subsequently taken to the Lake County coroner's facility. At 11 a.m. the same day the chief medical investigator for the Lake County coroner took a blood sample from the body. Tests performed on that sample showed an alcohol concentration of 0.18, which was higher than that of the defendant.

Prior to trial, the State moved to exclude this evidence on the grounds that (1) the blood sample was not drawn from the decedent within six hours of the accident causing his death, or at the direction of a licensed physician, as required by section 10 of "An Act to revise the law in relation to coroners" (hereinafter the Coroner's Act) (Ill. Rev. Stat., 1982 Supp., ch. 31, par. 10); and (2) the chief medical investigator for the Lake County coroner was not qualified by the Department of Public Health under section 11—501.2 of the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.2) to withdraw blood samples. The State informed the trial court that, aside from the excessive delay, it had no quarrel with the method by which the blood sample was taken, and that, as far as the State knew, it had no quarrel with the analysis of the sample. The defendant opposed the State's motion, and the trial court granted it, excluding the specific test results, but permitting the defendant to show that blood samples taken from the decedent's body after the accident showed "some alcohol."

In this court the defendant contends that neither the Coroner's Act nor the Illinois Vehicle Code required the exclusion of the test results, and that he was improperly deprived of an opportunity to present relevant evidence in his defense on the question of whether

he caused the accident which resulted in the death. In response, the State raises an issue it did not present to the trial court by arguing that the degree of intoxication of the decedent driver was not relevant. The State also relies on the statutes it cited to the trial court and argues that if the exclusion of this evidence was error, it was harmless error.

It is our judgment that, considering the totality of the evidence introduced in this case on the question of whether the defendant caused the accident and death, the exclusion of the test results, if error, was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) In this regard it should be noted that the State was not required to prove that the defendant's acts were the sole and immediate cause of death, but rather that they were a contributing cause such that death did not result from a cause unconnected with the defendant. *People v. Brown* (1973), 9 Ill. App. 3d 730, 293 N.E.2d 1; *People v. Kent* (1982), 111 Ill. App. 3d 733, 444 N.E.2d 570.

Diane Van Allen, the passenger in the decedent's car, testified that the defendant's car was more than halfway in the decedent's lane prior to the collision. She said that she knew the defendant's car was in the wrong lane because she could see the center line. Christine Militello, who happened to be driving her car behind the decedent's Corvette, testified that the defendant's Thunderbird was "half over" into the decedent's lane. Militello said that visibility was fairly good at the time of the crash.

Officer Dennis Keys, the evidence technician, testified that the debris from the collision was all in the decedent's lane of traffic except for one piece on the shoulder of the defendant's lane. He gave his opinion, based on the location of the debris and the cars after the collision, that the accident occurred in the decedent's lane. The only evidence to the contrary was the defendant's testimony that he was in his own lane at the moment of impact. Yet, the defendant also testified that visibility was very poor for him, and he admitted that, as he approached the scene of the collision, he could not see the center line.

In light of this evidence, even if the jury had been informed of the degree of the decedent driver's intoxication as shown by the test results, the jury could not but have found that the defendant drove his car into the wrong lane and thereby contributed to cause the accident and death. Accordingly, the exclusion of the results of the testing of the decedent's blood, if error, was harmless beyond a reasonable doubt. See *People v. Boyce* (1981), 95 Ill. App. 3d 740, 420 N.E.2d 687.

1054

For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

NASH, P.J., and REINHARD, J., concur.