THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EMIL JOSEPH WIELAND, Defendant-Appellant.

Fourth District   No. 4—83—0446

Opinion filed April 17, 1984.

Daniel D. Yuhas and Janet Sinder, both of State Appellate Defender's Office, of Springfield, for appellant.

Ronald C. Dozier, State's Attorney, of Bloomington (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Emil Wieland, was tried by a jury, convicted of murder, involuntary manslaughter, robbery, aggravated battery, and battery, and sentenced to concurrent terms of imprisonment of 27 years for murder, seven years for robbery, and five years for aggravated battery. The defendant and another person beat and robbed their victim, William Spates, who was in his sixties. On appeal the defendant argues that his inculpatory statements should have been suppressed because they were made after the police failed to honor his request for counsel, that the State failed to prove that any of his or his partner's acts contributed to the death of Spates, that the State failed to prove that the murder occurred in the course of a robbery, and that certain convictions must be vacated because they are included offenses of murder or arose out of the same acts as the murder and therefore are redundant. We affirm.

The defendant's trial began April 15, 1983. Dr. Bak Lee, the pathologist who performed an autopsy on the victim, William Spates, on November 22, 1982, testified that the body had been found the previous day. At the time of the autopsy the body was badly decomposed, and Lee estimated that Spates had been dead for five to 10 days. Lee could not determine the cause of death with certainty. He reported to the coroner's office that Spates had died from coronary sclerosis, pulmonary congestion, hemorrhage, bronchiectasis, and pleural fibrosis. He did not find any large traumas or lacerations; the decay of the body hid any small trauma. The State asked Lee to assume that Spates was hit in the face and head several times by two young men, that Spates was moderately to severely intoxicated at the time, and that Spates ended up on the floor bleeding and unconscious or barely conscious. Lee said that the facts presented in the hypothetical question "could have been a contributing factor" to the victim's death; he could not say that they caused death.

Richard Lowthian, of the Michigan State police, testified that he questioned the defendant December 16, 1982, in Michigan. At first,

the defendant said that Spates had invited him and his partner, Bill Stout, into his apartment to drink. Spates was intoxicated. The defendant later added that he took $1.72 from Spates' trouser pocket at this time. Spates was alive when the defendant left, and the defendant denied doing anything to Spates.

Detective Charles Crowe of the Bloomington police department questioned the defendant several times in Bay City, Michigan, in December 1982. The first interrogation occurred December 15. Crowe testified that the defendant told him that he and his partner, Bill Stout, went to the building where Spates lived on November 15, 1982, to talk to the landlord about renting an apartment. They saw a black man with a whiskey bottle, and they gave him a bottle of beer, which they had brought along. The man, Spates, bought a car from the landlord and left. The defendant and Stout then visited a friend, Jamie, who lived in that building. An hour or two later, as they were leaving, they saw the black man again, who gestured for them to go into his apartment. The three drank from a bottle of whiskey that the man had. The man was very drunk. The defendant and Stout left after a while.

Crowe testified that his second conversation with the defendant took place in the morning of December 16, 1982. The defendant gave virtually the same version of events that he had given the preceding day. This time, though, the defendant added that he believed that Spates must have been bleeding because Stout had blood on his hands after they left. The defendant also added that he had left his coat as a cushion for Spates' head.

Crowe testified that his third conversation with defendant took place in the afternoon or evening of December 16, after the defendant had talked with Lowthian, the Michigan law enforcement officer. This third version of events differed substantially from the earlier two. The defendant said that Spates and Stout were arguing in Spates' apartment. Stout pushed, shoved, and slapped Spates. The defendant believed that the argument "had something to do with them living together before." The defendant opened his pocketknife and gave it to Stout, who waved it in front of Spates. Stout told Spates that he would have to pay them money for protection and that they were members of a criminal organization—this demand was just a joke, though, for they were not actually members of a criminal organization. Stout then punched Spates several times in the face, and the defendant punched Spates on the side of the head several times. Stout asked Spates for his social security check, but Spates denied having any money. The defendant, when asked by Crowe whether he was hit-

ting Spates to get his money, said that he "was hitting the old man so that [Stout] would give up and leave." The defendant took about $2 from Spates' trousers; Spates was lying on his stomach, bleeding, but alive when they left. They did not remove Spates' wallet, which contained $84, from his trousers.

Other evidence presented by the State showed that Spates received three public aid checks totaling about $900 on Friday, November 12, 1982. On that day, he rented the apartment where he was later found dead. On Sunday, November 14, Spates moved into the apartment. On Monday, November 15, Spates cashed a $570 public aid check, receiving $300 in traveler's checks and the balance in cash. Later that day, Spates went to the apartment of the building manager and paid his rent and a loan. The defendant and Stout were there. Spates also bought a car from the manager for $75.

Anthony Johnson, a resident of a neighboring building, testified that on a Thursday evening in November 1982 he saw three persons in a fight in an apartment in the building where Spates lived. Later that evening, as Johnson walked by the building, he saw two persons standing and looking down at the floor. He identified one of the persons as Stout, but he could not identify the other. Johnson, who eventually received $1,000 for his information, said that when he first talked to the police about it he did not realize that he might receive a reward.

The defendant's only witness was Jamie Hellige, 18 years old, who lived in the building where these events took place. Hellige knew both the defendant and Stout; they were in her apartment Monday, November 15, from 9 p.m. until about midnight. Hellige had first seen Spates that day. She also saw Spates outside the building two days later, on November 17, at about 10 p.m.

In sentencing the defendant the trial judge found that the convictions for involuntary manslaughter and simple battery were redundant and imposed only three terms of imprisonment—27 years for murder, seven years for robbery, and five years for aggravated battery—and they were to run concurrently.

I

■ The defendant argues first that he was improperly questioned by police after asking to consult with a lawyer. The defendant believes that this violated his Federal constitutional privilege against self-incrimination. The trial court denied the suppression motion, finding that the defendant did not unequivocally request counsel.

Detective Charles Crowe of the Bloomington police department

testified that he traveled to Bay City, Michigan, December 15, 1982, to talk to the defendant, who was being held in the county jail there. Crowe spoke to the defendant that day and about 10 a.m. the next day, December 16. During that second conversation, the defendant said that he would take a polygraph examination later that day. In the afternoon, about 3:15, Crowe saw the defendant outside a courtroom, where the defendant had gone for a hearing on some Michigan charges. Crowe testified:

> "I asked him if he was ready to take the test, and he said he didn't know because they didn't appoint him an attorney. And I said, this morning you were all set to take the test, you didn't mention anything about an attorney. The test is all set up. And then I asked him if he wanted to just go ahead and get it over with now, and he said yes."

Crowe believed that the defendant was referring to the appointment of a lawyer for the Michigan charges that had required the defendant's presence in that courtroom moments earlier. The defendant was taken to the headquarters of the Michigan State police, where the polygraph test was given. After that, Crowe took another written statement from the defendant. That statement was Crowe's third conversation with the defendant, and it is the one that the State relies on here to sustain the convictions. Crowe testified that the defendant was given *Miranda* warnings before all these interrogations.

The defendant was the only other witness at the suppression hearing. He testified that on December 16, 1982, he was being held in the Bay City, Michigan, jail. About 3 o'clock that afternoon he attended a hearing on his motion for the appointment of counsel for a probation revocation case. One was going to be appointed. The defendant testified that as he left the courtroom, he saw Detective Crowe:

> "A. Mr. Crowe asked me if I was ready to take a polygraph test.
>
> Q. Did you make any response to that?
>
> A. I said I wasn't for sure because I didn't have a lawyer.
>
> Q. What, if anything, did Detective Crowe tell you at that point in time?
>
> A. He said that I was all ready this morning and he asked me if I just didn't want to go through with it then.
>
> Q. What did you say?
>
> A. I said, well he asked me if I was afraid to go through with it. I said no."

Later that day, the defendant took the polygraph test and then in a third interrogation with Crowe in Michigan gave the statement that is

the subject of the motion to suppress. Defendant testified that when he mentioned having a lawyer, Crowe "might have been a little upset." On cross-examination, the defendant testified that he told Crowe, "I'm not for sure, I would like to have a lawyer." The defendant acknowledged receiving and waiving *Miranda* rights preceding each separate interrogation.

The trial judge denied the suppression motion, concluding that the defendant's reference to a lawyer "was not an unequivocal request for counsel." The judge found substantial agreement between Crowe's testimony and the defendant's testimony on direct examination, and he based his decision on that, rather than on the statement related by the defendant in cross-examination—"I'm not for sure, I would like to have a lawyer." Resolving evidentiary conflicts is within the trial court's special province, and the trial judge's decision here to accept as true the version related by Crowe and by the defendant on direct examination, rather than the version related by the defendant on cross-examination, was reasonable.

The trial judge distinguished the defendant's remark here from the direct request for counsel that was made in *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880. In *Edwards* the Supreme Court held that once an accused requests a lawyer, he cannot be questioned further without one, unless later on he himself initiates communication with the police. As a corollary to this *Edwards* also held that an accused's response to further questioning does not by itself operate to waive an earlier request for counsel. In *Edwards* the defendant requested counsel while being questioned and the interrogation then stopped. The next day, the police wanted to question the defendant further, though he had not been afforded counsel and said at first that he did not want to talk. After being given *Miranda* warnings, the defendant said he would talk. The court held that the defendant's request for counsel did not disappear overnight and that it was not waived by his answering questions the next day.

The source of the observation that an accused's request for counsel need not be unequivocal to be effective is the statement in *Miranda v. Arizona* (1966), 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612, that if an accused "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning."

In *People v. Krueger* (1980), 82 Ill. 2d 305, 412 N.E.2d 537, the defendant, while being questioned by three police officers, said, "Maybe I need a lawyer," or words to that effect when the topic of the interrogation changed from burglaries to the murder that the

defendant was eventually convicted of. The questioning continued after the defendant's remark. The supreme court held that the defendant's remark concerning a lawyer was not a request for one. Discussing how precise or explicit a request for counsel must be, the court said:

> "*Miranda*'s 'in any manner' language directs that an assertion of the right to counsel need not be explicit, unequivocal, or made with unmistakable clarity. We do not believe, however, that the Supreme Court intended by this language that every reference to an attorney, no matter how vague, indecisive or ambiguous, should constitute an invocation of the right to counsel." (82 Ill. 2d 305, 311, 412 N.E.2d 537, 540.)

The court in *Krueger* also observed that none of the police officers construed the defendant's remark as a request for counsel; the court said that the officers' subjective beliefs were entitled to consideration.

The reference to a lawyer in this case seems to reflect at most the defendant's indecision, assuming that he was referring to the charges here and not to the Michigan charges. Perhaps the defendant was not sure whether he should take the polygraph test without first speaking to a lawyer. The defendant realized that he did not have counsel, and for that reason he expressed some hesitation and uncertainty. This is less definite than the statement in *Krueger*, "Maybe I need a lawyer," which was found not to be an invocation of the right to counsel. Also, Detective Crowe believed that the defendant was referring to the just-completed hearing on the Michigan charges rather than to the questioning for this prosecution. Crowe's reminder to the defendant about his decision that morning to take the polygraph test may therefore be interpreted as an effort to focus the defendant's attention on this case and away from the Michigan matters. We conclude that the trial judge did not err in denying the defendant's motion to suppress his inculpatory statements.

## II

■ The defendant argues next that the State failed to prove beyond a reasonable doubt that he or Stout—the jury was instructed on accountability—committed any acts that caused or contributed to Spates' death. The defendant relies primarily on Dr. Lee's uncertainty about the cause of Spates' death.

In *People v. Kent* (1982), 111 Ill. App. 3d 733, 444 N.E.2d 570, the defendant's conviction for murder was reversed because of insufficient proof that the defendant had caused her infant child's death. The State presented evidence that the child died from acute alcohol-

ism, and the defendant admitted having fed the child a mixture of beer and water for more than three months, in addition to the baby's normal diet. The court said:

"In every murder prosecution, proof of death and proof of criminal agency causing death are elements the State must prove beyond a reasonable doubt. (*People v. Guthrie* (1980), 85 Ill. App. 3d 831, 407 N.E.2d 593; *People v. Brown* (1978), 57 Ill. App. 3d 528, 373 N.E.2d 459.) Although it is not necessary to prove that defendant's act is the sole and immediate cause of death (*Brown*), the State must nonetheless prove that defendant's act was beyond a reasonable doubt a contributing cause such that death did not result from a cause unconnected with defendant. (*Brown*, citing *People v. Brown* (1973), 9 Ill. App. 3d 730, 293 N.E.2d 1.) The means and manner may be inferred from the circumstances proved, but guilt must be so established as to exclude reasonable hypotheses of innocence. *People v. Kinzell* (1969), 106 Ill. App. 2d 349, 245 N.E.2d 319." (111 Ill. App. 3d 733, 738, 444 N.E.2d 570, 574.)

In *Kent* the scientific testimony connecting the defendant's acts to her child's death was uncertain. All the experts—including the State's—agreed that the autopsy findings were consistent with three other fatal ailments; a scientific test that would have been dispositive was not performed; the amount of alcohol fed to the child was not established; the small amount of alcohol found in the child's muscle tissue was consistent with normal bodily decomposition; too few tissue samples were taken to preclude error or contamination. The appellate court found insufficient evidence of criminal agency and reversed the conviction.

Here the pathologist, Dr. Lee, testified that Spates' death could have been caused by natural causes or could have been caused by the beating alleged. According to the defendant's statement to Detective Crowe, Stout shoved and pushed Spates around the room, and then the defendant and Stout punched the man several times on the head, perhaps causing him to lose consciousness. Spates was bleeding. Blood stains were found on the walls and floor of the apartment. It appears that when Spates was found on November 21, 1982, he was wearing the clothes that he was wearing on November 15. The jury was not required to accept Hellige's testimony that she saw Spates on Wednesday, November 17. Anthony Johnson believed that he saw a fight on a Thursday in November but was not certain. The evidence is sufficient to support the conclusion that the beating administered by the defendant and Stout caused or contributed to Spates' death.

### III

■ The defendant was charged and convicted under the theory of felony murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(3), based on the allegation that he was committing a forcible felony, robbery, while performing the acts that caused Spates' death. The defendant argues that the State's proof of his committing robbery is too weak to sustain the conviction; specifically, the defendant argues that the State failed to show that he and Stout were trying to rob Spates in striking him. The defendant argues that his taking money from Spates' pocket may have been an afterthought and not connected to the earlier beating.

Robbery occurs when a person "takes property from the person or presence of another by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1981, ch. 38, par. 18—1(a).) The defendant's third statement to Detective Crowe supplies the necessary evidence that the beating was inflicted on Spates in an effort to rob him. According to the defendant, he handed Stout an open knife, who then threatened Spates with it while demanding money for protection. Later, Stout asked Spates for his social security or relief check. The defendant punched Spates several times and took money from Spates' pocket at the conclusion of the beating. This is sufficient proof that Spates was beaten so that he could be robbed, and that constitutes a felony murder. See *People v. Griffith* (1979), 68 Ill. App. 3d 188, 385 N.E.2d 843 (victim shot by defendant or accomplice during robbery).

### IV

■ The defendant argues last that if his conviction for murder is affirmed, the four other convictions—involuntary manslaughter, robbery, aggravated battery, and battery—must be vacated. The trial judge sentenced the defendant only on the murder, robbery, and aggravated battery convictions. The State agrees with the defendant that the convictions for involuntary manslaughter and robbery will have to be vacated if the murder conviction is affirmed, but argues that the aggravated battery conviction may remain. The State agrees that the conviction for simple battery also has to be vacated—it is redundant under the aggravated battery conviction.

Multiple convictions must be vacated in two instances: when they are based on the same physical act, or when one is an included offense of the other. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838; Ill. Rev. Stat. 1981, ch. 38, par. 2—9.) The aggravating element in this battery was the defendant's age, which was over 60. (Ill. Rev.

Stat. 1981, ch. 38, par. 12—4(b)(10).) As the State points out, the aggravated battery could not be an included offense of any of the others, for it contained one element—the victim's age—that was not required in any of the other offenses.

Nor were the murder and aggravated battery necessarily based on the same act, for the defendant by his own admission to Detective Crowe hit Spates several times. The separate punches may therefore support the convictions for murder and aggravated battery. *People v. Rathgeb* (1983), 113 Ill. App. 3d 943, 447 N.E.2d 1351.

For the reasons given, we affirm the defendant's convictions and sentences for murder and aggravated battery, vacate the conviction and sentence for robbery, and vacate the convictions for involuntary manslaughter and battery.

Affirmed in part, vacated in part.

MILLS, P.J., and WEBBER, J., concur.