THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACK FULLER, Defendant-Appellant.

Third District   No. 3—85—0154

Opinion filed March 11, 1986.

738

Ronald E. Halliday, of Peoria, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Rita K. Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SPITZ delivered the opinion of the court:

A jury convicted defendant of felony murder, two counts of aggravated battery, and robbery. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(3), 18—1, 12—4(a), 12—4(b)(10).) The trial court vacated the aggravated battery and robbery convictions and sentenced defendant to 30 years' imprisonment on the murder conviction. Defendant appeals, arguing that the trial court erred in ruling on his motion to suppress, he was not proved guilty beyond a reasonable doubt, and the trial court erred in instructing the jury. We affirm.

Defendant made four statements to the police. Initially, he made oral and written exculpatory statements to the police prior to being advised of his constitutional rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Subsequently, defendant waived his *Miranda* rights and made an inculpatory oral statement followed by a similar written statement. Defendant filed a motion to suppress his statements, alleging he was arrested without probable cause, his statements were involuntary, the waiver of his rights was involuntary, and the inculpatory statements and all other evidence in the case was the fruit of an initial illegality and should be suppressed.

The following evidence was presented at the hearing on the suppression motion. On June 2, 1984, 76-year-old Paul Micono was injured during the robbery of his business. He died on June 28. On that day, Dale Whitledge, an investigator for the Peoria police department, and three other police officers were assigned to the investigation. Whitledge canvassed the area around Micono's business and home without turning up any leads. At approximately 5 p.m., Whitledge returned to the station to investigate a fight involving juveniles. One of

the juveniles stated that he had seen defendant take three milkshakes. After confirming this information by talking to the other juveniles, Whitledge arrested defendant.

As he was filling out referral forms on the theft, an officer asked Whitledge why he was processing juvenile arrests. Whitledge responded that he was supposed to be working on the instant case. Whitledge testified that he was upset. Therefore, he looked at defendant and asked if defendant knew anything about the Micono matter. He then told defendant that he would drop the theft charge if defendant could tell him who had killed Micono. Defendant stated that Mike and Dave had robbed Micono. Whitledge and defendant went into an office, where defendant stated that a man named Dave told defendant that he and Mike had robbed Micono, using the proceeds to buy a truck. Defendant identified Michael Thomas' picture. Defendant was not under arrest for the Micono robbery or a suspect in it. Before the police took him home, defendant gave a written statement which paralleled his oral statement. The theft charge was dropped.

Approximately two hours later at about 10:15 p.m., defendant returned to the station with Whitledge, who advised defendant of his *Miranda* rights. Thomas had implicated defendant in the robbery-murder. At first defendant maintained his original statement was true. Inspector Sammy Hoskins told defendant that Thomas stated that defendant had kicked Micono and taken his money. Defendant then admitted his involvement in the incident.

Whitledge further testified that defendant said that he had been at his girlfriend's house and left with his girlfriend's brother, Butch. They were riding bicycles when Thomas and Sutton approached them in the alley behind Micono's business. Thomas asked defendant to help rob Micono, explaining that Sutton could not enter because Micono would recognize him as a customer. Defendant entered, asked for a tool, and kicked Micono in the leg. Micono dropped his cane and, in falling, pulled a dolly on top of himself. Defendant then asked Micono for his money and took a money roll out of Micono's front pocket. Thomas gave defendant $20, but defendant only kept $5. Subsequently, defendant gave a written statement to the same effect as the oral statement.

The police contacted Ralph (Butch) DeWitt, who indicated that defendant admitted robbing Micono. The police also retrieved receipts from the tool rental shop. One had Sutton's palm print on it. Prior to Micono's death, only one officer was assigned to the case. After Micono's death, Whitledge, Hoskins, and Charles Cannon were assigned to the case.

Whitledge stated that he did not threaten, physically or mentally harass, or promise defendant anything other than release on the milkshake-theft charge. Defendant was allowed to drink, smoke, and use the restroom. He appeared coherent. Defendant was under arrest at 8:15 p.m. when he made the first statement. He had not been arrested pursuant to a warrant, and the police had not observed him engaging in illegal conduct. Prior to defendant's initial statement, the police did not have any leads in the Micono investigation. One of the juveniles involved in the fight over possession of defendant's radio told Whitledge that defendant and two friends had ordered milkshakes. Defendant took the milkshakes without paying for them and ran. One of defendant's friends took his radio. Later, defendant's friends encountered two other juveniles, who tried to take the radio from them. The other juveniles substantiated this information. None had previously given the police any information on crimes. Based upon this information, Whitledge arrested defendant, who was at the police station seeking the return of his radio.

Hoskins testified that he interviewed Sutton based upon defendant's initial statement. He advised Sutton of his *Miranda* rights. Sutton implicated defendant.

Cannon testified that he interviewed two witnesses who indicated that Sutton and Thomas had made admissions about the robbery. On June 28, 1984, Cannon talked to Thomas, who waived his *Miranda* rights and implicated defendant, himself, and Sutton. On cross-examination, Cannon admitted that he had obtained the two witnesses' names from Sutton and Thomas. He did not know of Sutton or Thomas until after defendant's initial statements.

The trial judge found that probable cause existed for the arrest. Therefore, no fourth amendment violation occurred. However, he found that defendant was in custody and subject to custodial interrogation. The judge noted that the initial statements were voluntary and the only coercion present was that inherent in a custodial situation. The court held the initial exculpatory statements were inadmissible as being in violation of *Miranda*. Although the judge noted that the initial statements led to Thomas and Sutton, whose statements implicated defendant and led to his inculpatory statement and other information, he found Thomas' and Sutton's statements were an independent source, the police had intensified their investigation, and Sutton's palm print had been found at the scene. Defendant had been released after making the initial statements. Therefore, the subsequent evidence and inculpatory statements were sufficiently attenuated from the inadmissible initial statements and need not be suppressed.

Defendant argues that although his unwarned witness statements were properly suppressed, the trial court erred in failing to suppress all subsequent evidence and defendant's subsequent oral and written confessions. Defendant argues both fourth and fifth amendment violations occurred. He maintains that all the information would not have developed but for the statement which led to Thomas. Therefore, all the evidence is fruit of a poisonous tree and should be suppressed. Defendant relies principally upon suppression cases involving fourth amendment violations. In the alternative, defendant argues that derivative evidence from the *Miranda* violation should have been suppressed.

The State argues that defendant was not subject to custodial interrogation prior to his exculpatory statements. Therefore, the trial court erred in suppressing them and derivative evidence concepts do not apply. In the alternative, the State, relying upon *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285, argues the analogy to the fourth amendment is no longer applicable in fifth amendment violation settings.

■ The existence of probable cause for an arrest is determined by the facts and circumstances of each case as known to the arresting officer at the time of the arrest. (*People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.) When the facts and circumstances are sufficient to warrant a reasonable man to believe an offense has been committed and that the person arrested committed the offense, probable cause exists. (*People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228, *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564.) The facts relied upon must be specific and articulable. (*People v. Quarles* (1980), 88 Ill. App. 3d 340, 342-43, 410 N.E.2d 497, 499.) In the instant case, Whitledge had eyewitness statements from several persons that earlier that day defendant had taken milkshakes without paying for them. Defendant was at the police station. Whitledge had probable cause to arrest him. *People v. Riszowski* (1974), 22 Ill. App. 3d 741, 318 N.E.2d 10.

■ The State relies upon two cases in arguing that defendant was not subject to custodial interrogation when first questioned. Both involved investigatory questioning in noncoercive environments. They are distinguishable from the instant situation and do not apply. (See *People v. McIntosh* (1977), 53 Ill. App. 3d 958, 369 N.E.2d 217; *People v. Dunn* (1975), 31 Ill. App. 3d 854, 334 N.E.2d 866, *cert. denied* (1976), 426 U.S. 950, 49 L. Ed. 2d 1187, 96 S. Ct. 3171.) In distinguishing between investigatory and custodial interrogations for fifth amendment purposes, the analysis should consider the knowledge pos-

sessed by the police, tone and method of questioning, and whether the accused was the focus of the investigation. (*People v. McIntosh* (1977), 53 Ill. App. 3d 958, 369 N.E.2d 217; *People v. Dunn* (1975), 31 Ill. App. 3d 854, 334 N.E.2d 866.) Custodial interrogation means questioning initiated by law enforcement personnel after a person has been arrested or significantly deprived of his freedom. (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612; *People v. Gore* (1983), 116 Ill. App. 3d 780, 783, 452 N.E.2d 583, 586.) An accused must be advised of his fifth amendment rights prior to custodial interrogation. *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

■ Here, defendant was at the police station, in an inherently coercive environment, and under arrest, when Whitledge asked him direct questions about the Micono incident. A negotiated exchange of information occurred. The fact that the police somewhat fortuitously gained information which led to the resolution of the instant offense does not alter the fact that defendant was in custody and not advised of his *Miranda* rights prior to the exculpatory statements. No error occurred in suppressing the exculpatory statements. The fact that the statements were exculpatory in nature does not change the result. *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Hoffman* (1981), 84 Ill. 2d 480, 419 N.E.2d 1145.

In the instant case, defendant, relying upon an analogy to fourth amendment exclusionary principles, argues his inculpatory statements are inadmissible and all evidence obtained as a result of his exculpatory statements is inadmissible as stemming from the initial illegality. In *Elstad*, the Supreme Court held that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

Elstad was convicted of burglarizing a neighbor's home. The police obtained a warrant for his arrest and talked to him in the living room of his home. An officer told Elstad that the police believed that he was involved in the burglary. Elstad admitted that he was present. The police then arrested Elstad, transported him to the sheriff's office, and advised him according to *Miranda*. Elstad gave a written statement admitting his involvement in the offense. The district court ruled the first statement was inadmissible because of a failure to warn defendant. However, it found the second statement was voluntary, *Miranda* had been given and waived, and the second statement was not tainted by the first. Elstad appealed, arguing the second statement was tainted by the illegality involved in the first statement.

The Supreme Court noted that the circuit court reversed the district court and found that the second statement was not sufficiently attenuated from the first statement to dissipate the taint of the initial failure to warn defendant. *Oregon v. Elstad* (1985), 470 U.S. 298, 300-03, 84 L. Ed. 2d 222, 226-28, 105 S. Ct. 1285, 1287-90.

The Supreme Court found the analogy to fourth amendment principles in determining the admissibility of subsequent confessions and derivative evidence inappropriate in a fifth amendment procedural *Miranda* violation context. The fourth amendment analogy assumes the existence of constitutional violations which would not necessarily exist in a failure-to-warn context. The admissibility of subsequent statements depends upon a determination of whether the statements were voluntarily made. *Oregon v. Elstad* (1985), 470 U.S. 298, 304-09, 84 L. Ed. 2d 222, 229-32, 105 S. Ct. 1285, 1293-94.

■ Under Illinois law, the admissibility of defendant's subsequently warned confession after an initial *Miranda* violation depends upon the voluntariness of the second statement. (*People v. Roberson* (1977), 46 Ill. App. 3d 750, 361 N.E.2d 116.) Voluntariness is determined after a consideration of the totality of the circumstances and depends upon whether the accused's will was overborne at the time of the statement. (*People v. Berry* (1984), 123 Ill. App. 3d 1042, 463 N.E.2d 1044; *People v. Colley* (1980), 83 Ill. App. 3d 834, 404 N.E.2d 378.) The fact that the first statement is inadmissible does not automatically render a subsequent statement inadmissible. *People v. Roberson* (1977), 46 Ill. App. 3d 750, 361 N.E.2d 116; *People v. Andrus* (1976), 37 Ill. App. 3d 533, 346 N.E.2d 435.

■ *Elstad* applies in the instant case. The admissibility of defendant's subsequent warned statements depends upon whether those statements and the waiver of his *Miranda* rights were voluntary. We note that defendant's first statements were exculpatory. Therefore, he would not be pressured into thinking that his subsequent statements were merely confirming the previous statements. The circumstances here show that the second statements were voluntary. The initial *Miranda* violation was technical in nature. Defendant concedes that he was not threatened or harassed at any time. He was not made physically uncomfortable. He was released after his exculpatory statements and went to his girlfriend's house. At least 2½ hours passed between the statements naming Thomas and the confession. Defendant does not argue that he did not understand the *Miranda* warnings. The subsequent statements considering all of the circumstances were voluntary and admissible. Derivative evidence concepts do not apply. No error occurred. *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed.

2d 222, 105 S. Ct. 1285.

■ Defendant next argues that he was not proved guilty beyond a reasonable doubt. A consideration of the evidence is necessary. Ralph (Butch) DeWitt testified that on June 2, 1984, he was with defendant in an alley behind Micono's business. Two men approached them, asking DeWitt to leave so they could talk to defendant. DeWitt identified Thomas' and Sutton's photographs and stated that he observed defendant and Thomas walk toward the entrance to Micono's Trailer, Truck & Tool Rental. Sutton stayed with DeWitt. Then, DeWitt heard tools or something heavy fall in the garage and saw defendant leaving the garage. Thomas said to run and pulled a roll of money out of his pocket. Later, defendant told DeWitt that he and Thomas had robbed Micono.

Whitledge then testified as to the substance of defendant's oral and written confessions. The oral statement has been recounted in relation to the suppression motion. The written statement differed slightly. Defendant indicated that Thomas took the money from Micono. The parties stipulated that Micono was operating his business on June 2, 1984. On that date, a police officer transported him to the hospital, where he remained until his death on June 28, 1984.

Gerald Fleischauer, a surgeon, testified that Micono had sustained: blunt trauma to his chest, bruising in the chest area, a partially collapsed lung, bruised lung, and bruised hands. Micono had abdominal and chest pain. Fleischauer admitted Micono to the intensive care unit of the hospital because of the injuries and Micono's medical history. Micono was 76 years old and had a history of congestive heart failure, diabetes, and lung problems. About 36 hours later, Micono developed severe respiratory distress and chest pain. X rays revealed an extension of the bruised lung, such that Micono could not breathe. The pulmonary edema impacted upon Micono's heart because the heart was not receiving sufficient oxygen to properly function. On June 5, 1984, Micono was placed upon a ventilator. At that time tests showed that Micono's primary problem was pulmonary in nature. Between June 5 and June 10, the condition of his lungs improved. However, on June 10, Micono suffered a heart attack. Micono's condition was unstable from that time until his death. His heart decreased in efficiency, and his kidneys began to fail. He continued to have problems with pulmonary edema, which compounded the heart condition. On June 26, 1984, Micono appeared to be improving, but the improvement was marginal. The next day Micono's heart went into auricular fibrillation. Although hospital personnel reestablished a heart rhythm, Micono went into a coma and died on June 28.

On cross-examination, Fleischauer testified that the June 10, 1984, myocardial infarction and the pulmonary edema were causally related. The edema placed stress on the heart. Fleischauer admitted that many conditions can cause myocardial infarctions. However, he thought it would be unusual for a person to get emotionally upset and cause a heart attack. He admitted that progress notes indicated that Micono was improving. However, the notes were relative to Micono's overall condition, which was poor. On June 21, Micono had pain in his abdomen which Fleischauer thought could be caused by an acute inflammation of the gallbladder. A test suggested that this was the problem. Fleischauer admitted gallbladder problems were not related to the June 2 trauma. On June 22, Micono's gallbladder was removed. During his post-operative period, Micono appeared to improve. On June 26, he sat up on the edge of his bed with assistance. On redirect examination, Fleischauer stated that Micono was extremely ill between June 22 and June 26. At no time after June 2 had he considered releasing Micono from hospital care.

John McGowan, a pathologist, testified that he performed an autopsy on decedent's remains. He found evidence of pulmonary edema, fluid in the lungs, and several myocardial infarctions, ranging in age from several hours to several weeks. Although he searched for pulmonary emboli, he did not find any. In his opinion, death resulted from a series of myocardial infarctions which were secondary to the trauma which caused Micono's hospitalization. McGowan admitted that the heart showed evidence of an episode of myocardial infarction predating June 2. He explained that the trauma to the lungs and chest caused difficulty in breathing which resulted in lack of oxygenation in the blood. Micono's heart, which was at risk because of arteriosclerosis, received further insult because of hypoxia and suffered repeated episodes of tissue death during his hospitalization.

On cross-examination, McGowan agreed that a 76-year-old man with a history of heart problems, hypertension, and diabetes could have had a myocardial infarction with or without trauma. Congestive heart failure may cause edema, but no evidence of edema existed in the instant case prior to June 2. McGowan further stated that he searched the pulmonary arteries, aortic arteries, heart, lungs, and abdominal cavity for emboli. He did not find any and stated that it was not possible for him to lose a blood clot on the dissecting table or in the body cavity. He admitted that post-surgical embolization is common, his report said the right lower lung suggested embolization, and the report did not describe his search of the pulmonary arteries for emboli. If a blood clot lodged in a pulmonary artery, death could

result. There was no evidence of pulmonary embolization in the instant case.

McGowan noted that there was no connection between chronic gallbladder disease, gallstones, and the June 2 trauma. The symptoms, which were interpreted as acute inflammation of the gallbladder, were caused by the failing heart. A person who has abdominal surgery within six months of a myocardial infarction is at a higher risk for subsequent attacks. Persons who have gallstones occasionally have pain resembling angina pain. When the gallbladder was removed, the condition was considered life-threatening. The surgery put tremendous stress on Micono and, considering Micono's condition, could have caused the myocardial infarction which caused Micono's death.

Edwin Shalgos, a forensic pathologist, testified for defendant. He was disappointed in McGowan's pathology report because the report did not note all of McGowan's findings and McGowan had followed a different procedural methodology then Shalgos would have followed. Shalgos inferred from the report that the pulmonary arteries, aortic arteries, heart, and lungs were not examined or only superficially examined for emboli. Therefore, he believed McGowan's conclusions were invalid, and evidence of embolization was overlooked. Micono was in poor condition when suspected gallbladder problems developed. His physicians discontinued Heparin, a drug which prevents clot formation, before surgery. After surgery, a clot formed. Shalgos stated that a clot broke away when Micono sat up on the edge of his bed. Embolization of blood clots can produce the same symptoms as heart attacks. Shalgos concluded that a blood clot or two, originating in the legs or abdomen, lodged in Micono's lung or pulmonary arteries and caused his death. McGowan missed the emboli or lost them due to his autopsy procedure. In Shalgos' opinion, the cause of death was pulmonary embolization related to gallbladder disease and subsequent surgery. Death was not related to the June 2 trauma.

Donald McRaven, a cardiologist, testified in rebuttal. He stated that death was caused by cardiac arrest secondary to coronary disease, with repeated episodes of angina and heart attacks occurring from June 2 until June 28. The trauma on June 2 set in motion a series of events leading to inadequate oxygenation of the blood and eventual death. McRaven was concerned about possible embolization. Tests conducted on June 13 and June 22 did not reveal any emboli. McRaven admitted that Micono's death could be consistent with pulmonary embolization; however, no emboli were found in the pulmonary arteries. Emboli may form from extended bed rest, trauma,

heart attack, or surgery.

Defendant argues that the State failed to establish beyond a reasonable doubt that Micono did not die from an intervening cause unconnected with his actions. He argues that evidence supports his theory that a blood clot formed as a result of gallbladder surgery. The State must prove defendant guilty beyond a reasonable doubt of all material and essential factors constituting the charged offense. (*People v. Weinstein* (1966), 35 Ill. 2d 467, 470, 220 N.E.2d 432, 434.) One who kills a person without lawful justification commits murder if the conduct which causes the death occurs during an attempt to commit or the commission of a forcible felony other than voluntary manslaughter. When an accused is charged with murder, the State must prove both the fact of death and the criminal agency causing death. (*People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368; Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(3).) The State is not required to show defendant's acts constituted the sole and immediate cause of death. It is sufficient to show defendant's acts were a contributing cause such that death did not result from a source unconnected with those acts. *People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368; *People v. Clark* (1984), 129 Ill. App. 3d 374, 378, 472 N.E.2d 814, 817-18; *People v. Martin* (1983), 112 Ill. App. 3d 486, 499, 445 N.E.2d 795, 806.

Cause of death is a jury question. (*People v. Sink* (1940), 374 Ill. 480, 30 N.E.2d 40; *People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225.) The jury may evaluate the expert testimony and weigh its relative worth in context. The mere fact that defendant's expert testifies favorably for him and expert testimony conflicts does not create a reasonable doubt. (*People v. Sink* (1940), 374 Ill. 480, 30 N.E.2d 40; *People v. Platter* (1980), 89 Ill. App. 3d 803, 816-17, 412 N.E.2d 181, 191.) A reasonable doubt does not exist because other factors may have contributed to decedent's death or because an individual without decedent's medical history might not have died from the trauma. *People v. Weiland* (1984), 123 Ill. App. 3d 576, 582-83, 462 N.E.2d 1256, 1261; *People v. Martin* (1983), 112 Ill. App. 3d 486, 445 N.E.2d 795.

Expert testimony that decedent, considering his medical history, could have died without trauma does not create a reasonable doubt. (*People v. Schreiber* (1982), 104 Ill. App. 3d 618, 432 N.E.2d 1316, *cert. denied* (1983), 459 U.S. 1214, 75 L. Ed. 2d 452, 103 S. Ct. 1214.) A jury may consider the medical evidence in context and is not required to search out a cause of death compatible with innocence. *People v. Brechon* (1979), 72 Ill. App. 3d 178, 390 N.E.2d 626.

■ In the instant case, expert testimony on cause of death directly conflicted. The jury could, however, have reasonably discounted defendant's expert's theory on the cause of decedent's death. Shalgos' opinion was principally based upon speculation that McGowan's testimony was inaccurate and that McGowan's technique was insufficient. A reviewing court will reverse a jury's verdict only where the evidence is so improbable, conflicting, or otherwise unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181.) Here, the evidence is sufficient to sustain a finding that decedent's death was caused by the June 2 injuries, which occurred during the commission of a felony. *People v. Weiland* (1984), 123 Ill. App. 3d 576, 462 N.E.2d 1256.

■ Defendant next argues that the jury was improperly instructed on cause of death. The record shows that defendant initially objected to the State's proposed cause of death instruction. The trial court accepted defendant's argument and modified the cause of death instruction. The modified instruction as given states:

"In order for you to find the acts of the defendant or one for whose conduct he is legally responsible caused the death of Paul Micono it is not necessary that you find the acts were the sole and immediate cause of death, but you must find beyond a reasonable doubt that they were a contributing factor such that the death did not result from a source unconnected with said acts."

Ordinarily, a party may not complain of his own instructions. (*People v. Sweeney* (1969), 114 Ill. App. 2d 81, 251 N.E.2d 897.) Additionally, we note that the Illinois Pattern Jury Instructions (IPI) do not define cause of death. (IPI Criminal (2d ed. 1981).) Both parties are entitled to instructions which accurately present their theories to the jury where their theories are supported by the evidence. (*People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319.) The decision on whether to give or refuse a non-IPI instruction rests within the trial court's discretion. (*People v. Stamps* (1982), 108 Ill. App. 3d 280, 438 N.E.2d 1282; *People v. Blackwell* (1979), 76 Ill. App. 3d 371, 394 N.E.2d 1329.) A non-IPI instruction, if given, should be simple, brief, impartial, and free from argument. (87 Ill. 2d R. 451(a).) Cause of death instructions are appropriate under the present circumstances. *People v. Brown* (1973), 9 Ill. App. 3d 730, 293 N.E.2d 1.

■ Defendant relies upon *People v. Dordies* (1978), 60 Ill. App. 3d 621, 377 N.E.2d 245. In *Dordies*, defendant was indicted for murder and armed robbery. The victim was an elderly man who was shot and died three weeks later. He underwent two surgeries while hospi-

talized and had multiple complications. The pathologist and treating physician differed on the exact cause of death. The defendant's argument centered on the fact that the second surgery may have caused death. The instruction given eliminated the language about an intervening causes of death. The appellate court found the instruction was improper because it did not consider defendant's possible defenses. See also *People v. Giovanetti* (1979), 70 Ill. App. 3d 275, 387 N.E.2d 1071.

Here, the instruction as given accurately incorporated the defense of an intervening act and the State's burden of proof. The instruction accurately stated the law. (*People v. Love* (1978), 71 Ill. 2d 74, 373 N.E.2d 1312; *People v. Gulliford* (1980), 86 Ill. App. 3d 237, 407 N.E.2d 1094.) No error occurred in instructing the jury.

For the above reasons, we affirm the trial court.

Affirmed.

WEBBER and MORTHLAND, JJ., concur.