THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES JONES, Defendant-Appellant.

First District (6th Division)   No. 1—89—0955

Opinion filed June 14, 1991.

Randolph N. Stone, Public Defender, of Chicago (Timothy Leeming, Assistant Public Defender, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Robyn Berman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder, armed robbery and unlawful restraint. He was sentenced to 30 years for murder, seven years for armed robbery and three years for unlawful restraint, the sentences to run concurrently. The issues on appeal are: (1) whether defendant's conviction for felony murder was improper and should be reversed; (2) whether defendant was denied a fair trial by the admission of "other crimes" evidence which impermissibly established defendant's propensity to commit the charged offense; and (3) whether defendant was denied a fair trial where the State, contrary to its purported pretrial representations, failed to introduce evidence of defendant's homosexuality. We affirm.

Officer John O'Brien testified that at around 3 a.m. on August 30, 1988, he responded to a call on his radio and proceeded to 79th Street and St. Lawrence, where he spoke with Lloyd Valentine. Valentine informed him that a man's body was located at 425 East 75th Street. When O'Brien entered the premises he found the body of the victim, Lawrence Taylor, on a bed. O'Brien also noted that there was an empty television stand, an extension cord which had been cut into smaller pieces and a butcher knife. According to O'Brien's testimony, defendant arrived on the scene around 5 a.m. and spoke with detectives.

Lloyd Valentine testified that on the evening of August 29, 1988, he went to an apartment at 7959 St. Lawrence in Chicago. The apartment was owned by Cornelius Mosley (Straw) and was

frequented by friends of Valentine. There were six men in the apartment when Valentine arrived. Valentine testified that defendant arrived later and asked if anyone wanted to purchase a 19-inch color television for $100. Valentine recognized defendant as a classmate from high school, and Valentine and his cousin decided to purchase the television. Valentine stated that he drove defendant to the store where it was located. Defendant then entered the building and returned with the television. According to Valentine, defendant stated that he lived in the back of the store with the victim, and that the victim passed out earlier that day from smoking "crack." Valentine then told defendant that if the "old man" (victim) was dead, defendant had killed him. Valentine drove defendant back to the location where he had gotten the television and ordered him out of the car. Valentine then contacted the police.

On cross-examination, Valentine stated that he spoke with the police for four hours regarding the incident with defendant and the television. He denied that Straw's apartment was a "base house" for illegal drugs or that he saw anyone getting high on the premises. When asked if he was using cocaine on the night of the incident, he replied, "Yes sir. No sir."

Deputy Medical Examiner Mitra Kaleikar testified that the victim had been 5 feet 9 inches in height, weighed 118 pounds and was 63 years of age when he died. The victim had puncture marks on both arms, scratches and bruises on the right side of his neck, his upper arms and wrists. She stated that the scratches and bruises on the victim's body appeared to be from the telephone wire and extension cord used to restrain him. Kaleikar further testified that at the time of his death, the victim's lungs were diseased from emphysema, he had severe coronary artery disease and his circulatory system was "atherosclerotic." She also stated that the victim had suffered a heart attack approximately seven days prior to the incident and that there was evidence of scarring. The aorta of the victim's heart was calcified and very brittle. Kaleikar added that because the heart attack had been substantial, any minor stresses such as walking up stairs or being angry or anxious could have caused his death. Kaleiker then testified that, in her opinion, the cause of the victim's death was the stress of his being tied up.

Dorothea Lyles testified that she was with the victim when he purchased the television and video recorder and had the receipts of purchase in her possession.

Kenneth Simpson testified that he was at Straw's apartment at 5 p.m. on August 29, 1988. Defendant arrived, spoke briefly to

Straw, and they left the apartment together. Four and one half hours later, Simpson saw defendant outside the apartment. Defendant told him that he had tied up an old man and asked Simpson to go with him to get the man's television. He also showed Simpson a gun and asked if Simpson wanted to help rob someone. When Simpson declined defendant walked away. Simpson was in Straw's apartment at 3 a.m. on August 30, 1988, when defendant arrived with a television and asked if anyone wanted to buy it. According to Simpson, defendant stated that the old man that he had tied to a chair had died, and that defendant had untied him and placed him on the bed.

Detective Thomas Krippel testified that he investigated the death of the victim on August 30, 1988. On his arrival at the victim's apartment, he found the victim lying facedown on a bed. He also found telephone wire and an extension cord. Krippel stated that while he was at the victim's apartment, Valentine and Simpson arrived. During his conversation with Valentine, he was told that Straw's apartment was a "base house" and that Valentine had seen people using cocaine.

Mark Sledge testified that at 6 p.m. on August 29, 1988, he saw defendant at Straw's apartment and went with defendant to an "Arab" store. Defendant claimed that the owners of the store owed him money. However, defendant left the store a few minutes later without collecting any money. Sledge then testified that he and defendant walked to a nearby furniture store. Before they entered the store, defendant pointed to scars on his face and told Sledge that he owed a guy some money. He then told Sledge that he knew the woman in the store and that she had a purse full of money. He then added that she had a friend with her who also had money. Sledge testified that defendant then pulled out a gun which he claimed was not real, but at that point Sledge refused to help defendant and walked away. Sledge stated that he returned to Straw's apartment several hours later, and while he was there, defendant arrived with a video recorder and asked about getting rid of it. Sledge also stated that defendant returned several hours later with a television which was subsequently removed from the apartment.

Assistant State's Attorney Catherine Quattrocchi testified that she spoke with defendant at 3 p.m. on August 30, 1988. At that time she wrote defendant's statement, read it back to him and obtained his signature. At the trial, the statement was read to the jury and into the record. In the statement defendant acknowledged

that he went to the victim's residence to obtain money for drugs. He tied the victim to a chair with an electrical cord but took the bindings off his wrist to make him more comfortable. He then left with the video recorder but returned sometime later and found the victim dead. He untied him, placed him on the bed and left with the victim's television.

■ Defendant contends that he was improperly convicted of murder under the felony murder statute because the victim's death from a heart attack was not a foreseeable consequence of defendant's felonious conduct. The felony murder statute provides:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> * * *
>
> (3) He is attempting or committing a forcible felony other than second degree murder." (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3).)

Defendant cites *People v. Jenkins* (1989), 190 Ill. App. 3d 115, 126, 545 N.E.2d 986, for the proposition that the felony murder doctrine holds a person responsible for deaths which occur as a direct foreseeable consequence of a felony committed by that person. In *Jenkins*, as well as *People v. Hickman* (1974), 59 Ill. 2d 89, 319 N.E.2d 511, which was cited by *Jenkins*, a police officer's death from the accidental discharge of a fellow officer's gun during that officer's struggle with the defendant was held to be a foreseeable consequence of defendant's felonious acts. (*Hickman*, 59 Ill. 2d at 94; *Jenkins*, 190 Ill. App. 3d at 127.) The *Hickman* court also stated that the fact that the defendant did not anticipate the precise sequence of events was unimportant. Where his unlawful acts precipitated the events leading to the victim's death, he was responsible for the consequences. (*Hickman*, 59 Ill. 2d at 94, citing *People v. Smith* (1974), 56 Ill. 2d 328, 307 N.E.2d 353.) In *Smith* the victim jumped through a third-story window when defendant, in the process of committing a burglary, broke into her apartment and threatened to kill her. The court rejected defendant's argument that his conduct did not provoke the victim's death and held that it might reasonably be anticipated that when defendant broke into the victim's apartment and threatened to kill her, his unlawful conduct might precipitate the sequence of events which resulted in the victim's death. *Smith*, 56 Ill. 2d at 333, citing *People v. Payne* (1935), 359 Ill. 246.

■ The issue of foreseeability in connection with the offense of felony murder was addressed by the Illinois Supreme Court in *People v. Brackett* (1987), 117 Ill. 2d 170, 180, 510 N.E.2d 877. In *Brackett*, the defendant beat and sexually assaulted a woman who was 85 years of age. She became severely depressed, refused to eat and was admitted to a nursing home. Shortly thereafter, she died. Medical testimony established that the victim died of asphyxiation which occurred when the victim's deep breathing was inhibited due to the pain of her injuries. On appeal to the supreme court, defendant contended that asphyxiation was not a foreseeable consequence of his felonious acts. The court held that even in cases where the precise manner of death was not foreseeable to the defendant while he was committing the felony, he was not relieved of responsibility for his conduct. The court then cited cases where the immediate cause of death was meningitis, pneumonia or a heart condition. (See *People v. Fuller* (1986), 141 Ill. App. 3d 737, 490 N.E.2d 977.) The court in *Brackett* stated:

> "In each of these cases the defendant's felonious acts contributed to the victim's demise, and in each of these cases the defendant could not foresee the exact manner in which the victim would die. We hold here that the defendant did not have to foresee that this victim would die from asphyxiation in order to be guilty of felony murder." (*Brackett*, 117 Ill. 2d at 180-81.)

Similarly, in *People v. Davis* (1988), 173 Ill. App. 3d 300, 527 N.E.2d 552, the court addressed the issue of foreseeability in reference to a jury instruction on felony murder. The court stated that although the victim's death in *People v. Hickman* was held to be a foreseeable consequence of defendant's conduct, foreseeability was only a factual observation rather than a pronouncement of what was an essential element of the felony murder offense. *Davis*, 173 Ill. App. 3d at 309.

■ In this case, the evidence at the trial established that defendant went to the victim's home and, prior to robbing him, defendant restrained him to a chair by tying him with an extension cord and telephone wire. Defendant then left with the victim's video recorder. Although defendant argues that the victim's death from a heart attack was not a foreseeable consequence of his conduct, we conclude that where his felonious acts of restraining the victim and robbing him precipitated the victim's heart attack and subsequent death, defendant is responsible for the consequences of his unlawful conduct. We also conclude that even if defendant did

not have knowledge of the victim's preexisting heart and lung disease, as he alleges, the victim's age and apparent underweight condition (5 feet 9 inches, 118 pounds) were known to defendant. According to Kenneth Simpson's trial testimony, defendant also knew of the victim's cocaine use. Thus, it could have reasonably been anticipated that tying him to a chair in such a manner that his body was bruised and scratched and leaving him in this condition for several hours could be stressful enough to cause some form of severe reaction that could result in the victim's death. We, therefore, conclude that defendant was properly found guilty of felony murder.

Defendant attempts to distinguish *Brackett* (117 Ill. 2d 170) and *Fuller* (141 Ill. App. 3d 737) from the instant case by focusing on the difference in the amount of force used on both victims, claiming that the victim's death from a heart attack was not foreseeable because he only tied the victim to a chair and did not hit him. However, the felony murder statute only requires that the unlawful conduct be a forcible felony. Pursuant to section 2—8 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 2—8), the robbery defendant committed was a forcible felony.

Defendant next contends that it was error to admit the testimony of Kenneth Simpson and Mark Sledge regarding defendant's solicitations to commit robberies because the evidence did not establish his intent to commit the offense charged.

At the trial Kenneth Simpson testified that, at approximately 10:30 p.m. on August 29, 1988, he was standing outside Straw's apartment when defendant approached him. According to Simpson, defendant made the statement that he left an old man tied up and had taken his video recorder. Defendant asked Simpson to go with him to the old man's apartment to get a television. When Simpson declined his offer, defendant pulled out a gun and asked Simpson to go with him to rob someone. Defendant claimed the gun was not real and he walked away.

Mark Sledge testified that he accompanied defendant to a furniture store where defendant made the statement, "See these scars on my face, I owe some guy money. I got to get money." Defendant then stated that he knew the lady who owned the store and that she had a purse full of money. He also added that the owner had a friend inside the store with her who also had money. Defendant then pulled out a gun which he said was not real, but at that point Sledge walked away.

■■ ■ Evidence of other crimes or wrongful conduct is not admissible to show a defendant's character or propensity to commit

the crime charged. (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85, 485 N.E.2d 1292.) However, evidence of other crimes is admissible where relevant to show *modus operandi*, intent, identity, motive or absence of mistake or for any relevant purpose other than the propensity to commit the charged offense. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821; *People v. Baptist* (1979), 76 Ill. 2d 19, 27, 389 N.E.2d 1200.) Where the "other crimes" evidence is being presented to show intent, an additional requirement for the evidence to be admissible is that there be some similarity between the "other crime" and the crime charged. (*People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59.) In establishing a common design or plan, a high degree of similarity between the other crime and the charged offense must be present because the evidence of the other offense is being offered to prove defendant's involvement in the charged offense. However, the same degree of similarity is not required where the evidence of the other offense is only being offered to prove defendant's criminal intent or absence of an innocent frame of mind. *McKibbins*, 96 Ill. 2d at 185-86.

In this case defendant's solicitation of Kenneth Simpson to return to the victim's apartment with him to get the victim's television was one of the charged offenses rather than "other crimes" evidence. His solicitation of Simpson and Sledge to commit other robberies was admissible to show defendant's criminal intent to commit a robbery. In addition, defendant's statement to Sledge that he owed some guy money in the context of the same conversation in which defendant was trying to solicit Sledge's assistance to participate in a robbery with him was also evidence of defendant's motive to commit the robberies with which he was charged.

■ Defendant raises two arguments regarding the admissibility of the evidence of his conversations with Simpson and Sledge. The first argument is that the evidence of "other crimes" was not properly admitted to show defendant's intent where defendant's attempted solicitation of Simpson and Sledge to assist him with the robberies occurred after the charged offense. However, evidence of other crimes to show defendant's criminal intent may be prior or subsequent to the charged offense. See *McKibbins*, 96 Ill. 2d at 186.

Defendant's second argument is that there was no similarity between the charged offense and the robberies defendant mentioned in his conversations with Simpson and Sledge. Defendant distinguishes the charged offense from the other robbery based on the

fact that defendant did not use a weapon or have an accomplice with the charged offense but solicited Simpson and Sledge as accomplices and indicated that he planned to use an allegedly "toy" gun in the commission of the other robberies. However, because the evidence of the other robberies was only being admitted to show defendant's criminal intent or absence of an innocent state of mind, only a general similarity to the charged offense was required. (See *McKibbins*, 96 Ill. 2d at 185-86.) We conclude that there was sufficient similarity between the robbery of the victim and the other robberies to which defendant referred to meet this requirement.

Finally, we also conclude that even if the admission of this evidence was error, it was harmless where there was other properly admitted evidence that defendant committed the forcible felony of robbery. *People v. Bacon* (1980), 91 Ill. App. 3d 673, 681, 415 N.E.2d 678.

Defendant's final contention was that he was denied a fair trial because defense counsel, in reliance on the State's representations, alluded to defendant's homosexuality during *voir dire*, his opening statement and cross-examination of the medical examiner. Defendant claims that the State's misrepresentations corrupted the proceeding, denied him his right to due process, effective assistance of counsel and an impartial jury.

Prior to the trial, defense counsel moved for the exclusion of any evidence regarding defendant's homosexuality. The State objected and indicated that it might want to introduce one of the statements defendant made to the police to the effect that he tied the victim to a chair because the victim became upset when defendant said he was ending their homosexual relationship. The State argued that it might want to use the evidence to show that defendant offered different explanations regarding the incident which was evidence of defendant's guilt.

■ Initially, we note that, contrary to defendant's argument, the State did not make any definite representations regarding its use of this evidence. Rather, the State indicated that it was undecided as to whether it would use the evidence of defendant's homosexuality as indicated by the following statements:

"I don't know, Judge, right now how we're going to proceed as far as statements.

* * *

*** No Judge, it depends I think in large part on how the evidence comes out through civilian witnesses and whether or

not the defendant himself intends to testify. I mean, I think there is [*sic*] a lot of variables."

Additionally, if defense counsel chooses to refer to evidence that will be introduced in his opening statement, he should be prepared to present the evidence at trial. It is not the responsibility of the State to present defendant's case nor can it be held accountable for defense counsel's choice of trial strategy. Finally, we note that defendant was unable to cite any authority in support of this contention. We, therefore, conclude that it was proper for the trial court to deny defendant's motion to compel the State to present evidence of defendant's statements regarding his homosexual relationship with the victim.

Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.

EGAN and LaPORTA, JJ., concur.